**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| LOUIS WALTON, | ) | |
| | ) | |
| Plaintiff, | ) | No. 10-344 |
| | ) | |
| v. | ) | |
| | ) | Magistrate Judge Michael T. Mason |
| VAN RU CREDIT CORP., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Michael T. Mason, United States Magistrate Judge:

On January 19, 2010, plaintiff Louis Walton ("plaintiff" or "Walton") filed a two-count complaint [1] against his former employer Van Ru Credit Corporation ("Van Ru") alleging (1) a hostile work environment as a result of sexual harassment; and (2) retaliation.  Van Ru now moves for summary judgment on both counts of Walton's complaint.  For the reasons set forth below, Van Ru's motion for summary judgment [39] is granted.[1]

## I.    Background

### A.    Van Ru's Policies and Guidelines

Van Ru is in the business of collecting debts on behalf of governmental and private entities and falls under the purview of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692 *et seq.*  (Def.'s LR 56.1 Statement of Facts ("SOF") [40]

---

[1] This Court has jurisdiction pursuant to 28 U.S.C. § 1331.  Venue is proper under 28 U.S.C. § 1391(b).  On April 15, 2010, the parties consented to the jurisdiction of the undersigned Magistrate Judge for all future proceedings pursuant to 28 U.S.C. § 636(c) [16].

¶ 1.)  Van Ru hired Walton as a "collector" in July of 2003.[2]  (*Id.* ¶ 2; Pl.'s Dep. Ex. 2 -

"Application for Employment.")  During his employment with Van Ru, Walton reported to

various supervisors and managers due to a number of reassignments to different

departments and client accounts.  (Def.'s SOF ¶ 25.)

At all relevant times, Van Ru had in effect a "Sexual Harassment Policy" (set

forth in the employee manual), which includes, among other things, a "Statement of

Prohibited Conduct," a "Schedule of Penalties for Misconduct," and "Procedures for

Making, Investigat[ing] and Resolving Sexual Harassment and Retaliation Complaints."

(Pl.'s Dep. Ex. 9.)  Walton acknowledged his receipt and understanding of the employee

handbook, as well as the sexual harassment policy on July 7, 2003.  (Pl.'s Dep. Exs. 10,

12.)  Van Ru also showed its employees a video educating them about sexual

harassment in the workplace.  (Def.'s SOF ¶ 15.)  On July 7, 2003, Walton signed a

form acknowledging that he viewed that video.[3]  (Pl.'s Dep. Ex. 13.)

Van Ru also had in effect certain rules and guidelines regarding conduct in the

workplace.  (*See* Pl.'s Dep. Ex. 11 - "Building Guidelines" & Ex. 14 - "Rules for

Professional Conduct.")  In particular, Van Ru prohibited "unprofessional

communication," including "profanity, slurs, swearing, unprofessional remarks/gestures

or disruptive communication."  (Pl.'s Dep. Ex. 11.)  With respect to interactions with

clients and debtors, Van Ru expected employees to abide by an inclusive, but not

---

[2] At his deposition, Walton admitted that certain representations on his application for employment with Van Ru were incorrect.  (Pl.'s Dep. Tr. 8-13.)  In particular, despite stating on his application that he left a past employer for a "better opportunity," Walton testified that he was actually terminated by that employer for irritating a customer.  (Pl.'s Dep. Tr. 10.)

[3] Although Walton admitted at his deposition that he signed the acknowledgment form, he denied having seen the video in 2003 at the time he was hired.  (Pl.'s Dep. Tr. 29.)  Instead, he testified that he saw the video at some point after the January 17, 2007 incident discussed in detail below.   (*Id.*)

exhaustive list of requirements set forth in the FDCPA. (Greco Aff. ¶ 7; Pl.'s Dep. Ex. 14.) Among many other things, Van Ru prohibited "the use of [a] less than business like approach with any debtor." (Pl.'s Dep. Ex. 14.) An employee who violates these rules and guidelines was subject to disciplinary action up to and including termination. (Pl.'s Dep. Exs. 11 & 14.) Walton acknowledged receipt and understanding of both the Building Guidelines and the Rules for Professional Conduct on July 7, 2003. (*Id.*)

### B.    Walton's Disciplinary History

Despite Walton's allegations that he was "never reprimanded in writing, suspended, or demoted for any reason" (*see* Compl. ¶ 3), Walton's personnel file reveals a different story. In December 2003, Donna Haffey, Van Ru's "Litigation Manager," spoke to Walton regarding his alleged habit of "punching in early for work and then going outside to smoke." (Pl.'s Dep. Tr. 41; Pl.'s Dep. Ex. 15.) Shortly thereafter, on February 16, 2004, Walton was the subject of an "Incident Summary Report" regarding his relationship with Haffey. (Pl.'s Dep. Ex. 16; Greco Aff. ¶ 12.) That report reflects Haffey and Walton's complaints to Van Ru's General Manager (and Walton's cousin) Shaun Crumble. Haffey complained about Walton's "negative attitude" and continued to state that he arrives early, clocks in, and returns to the parking lot to smoke. (Pl.'s Dep. Exs. 16, 17.) She also complained that Walton extended his fifteen minute break periods and made sporadic personal phone calls. (Pl.'s Dep. Ex. 16.) Walton on the other hand reported that Haffey singled him out, did not apply the rules consistently to all employees, and spoke disrespectfully to him on the collection floor. (*Id.*) As a possible solution to the conflict, Walton was offered the option to transfer to a different department. (*Id.*) Walton declined that offer. (*Id.*) At his deposition, Walton denied the behavior Haffey complained of, but remembered that a conference was held

3

regarding their troubled relationship.  (Pl.'s Dep. Tr. 41-42.)

An "Employee Discipline Report" dated April 5, 2004 indicates that Walton received a written warning and a one day suspension for "unprofessional conduct." (Pl.'s Dep. Ex. 18; Greco Aff. ¶ 13.)  According to the report, Walton called co-worker Lisa Zudis an "asshole bitch" for not giving him five dollars for his birthday even though he recently contributed five dollars for her birthday balloons.  (Pl.'s Dep. Ex. 18.)  The report also indicates that Walton understood that future violations may result in further disciplinary action, including termination.  (*Id.*)  Walton purportedly "refused to sign" the report.  (*Id.*)  At his deposition, Walton denied calling Zudis an "asshole bitch," seeing the written report or receiving a suspension.  (Pl.'s Dep. Tr. 50-52.)  Walton did admit that he called  Zudis a "jerk" and that he was sent home for the remainder of the day without pay.  (*Id.* at 52-53.)

On October 18, 2004, Walton received a written warning for violation of the FDCPA.  (Pl.'s Dep. Ex. 20; Greco Aff. ¶ 15.)  According to the Employee Discipline Report, Walton improperly advised a medical debtor that "he was going to report her outstanding debt to her credit report."  (Pl.'s Dep. Ex. 20.)  At his deposition, Walton admitted that he made the threat, that he was spoken to about the incident, and that he signed the report.  (Pl.'s Dep. Tr. 56-60.)  Also on October 18, 2004, Walton received a written warning for failing to properly document his accounts.  (Pl.'s Dep. Ex. 21; Greco Aff. ¶ 16.)  Approximately a year later, on September 30, 2005, Walton received another written warning for misrepresenting himself as the "Escalation Manager" in violation of the FDCPA.  (Pl.'s Dep. Ex. 22; Pl.'s Dep. Tr. 62-63.)

### C.    The January 17, 2007 Incident and Subsequent Investigation

On January 17, 2007, an incident took place between Walton, "dialer manager"

4

Alex Sosa, and collector Draper Hugan. On that date, Sosa approached Walton and Hugan and said words to the effect of "[Hugan] looked nice wearing a suit like he owned the company." (Pl.'s Dep. Exs. 23 & 24.) Sosa then walked in between Walton and Hugan's desk, got on his knees, made a sexual gesture, and stated: "If that camera was not behind us, I would suck [Hugan's] dick." (*Id.*) Walton purportedly told his immediate supervisor Tim Teague about Sosa's statements.[4] (*Id.*)

The following day, Walton submitted a written complaint detailing Sosa's comments and actions to Van Ru's General Manager Tricia McFarland. (Pl.'s Dep. Ex. 23; McFarland Aff. ¶ 4; Pl.'s Dep. Tr. 64-65.) In that statement, he described Sosa's comments as "a joke as usual." (Pl.'s Dep. Ex. 23.) When asked at his deposition what he meant by this characterization, Walton testified that Sosa "always makes homosexual jokes. They're not just regular jokes, they're all men-on-men jokes." (Pl.'s Dep. Tr. 69.) Hugan also submitted a written statement containing a similar description of Sosa's comments and actions to Human Resources Director Kathy Greco, who immediately forwarded the statement to McFarland. (Pl.'s Dep. Ex. 24; Greco Aff. ¶ 17.)

McFarland commenced an investigation of the incident on January 18, 2007 and took contemporaneous notes documenting that investigation. (McFarland Aff. ¶ 6; Pl.'s Dep. Ex. 25.) She started by interviewing Walton, Hugan, Sosa, manager Dehurtis Bryant, manager Herb Orengo, and Steve Anderson about their knowledge of the incident. (McFarland Aff. ¶ 7; Pl.'s Dep. Ex. 25.) Although Sosa denied having met with

---

[4] We note that plaintiff's complaint includes allegations that his "immediate supervisor at Van Ru" made "unwelcome sexual advances, comments and innuendos" toward him. (Compl. ¶ 6.) However, Walton made clear at his deposition that Alex Sosa was *not* his immediate supervisor or manager. (Pl.'s Dep. Tr. 38.)

McFarland one-on-one, he did admit to having spoken to her along with Greco and Vice President Dan Parks. (Pl.'s Dep. 73-74.)

During McFarland's interview with Sosa, he purportedly admitted to making the comment, but denied getting on his knees or making any sexual gestures. (McFarland Aff. ¶ 8; Pl.'s Dep. Ex. 25.) Sosa's denial prompted McFarland to view the security tape of the incident along with Greco, Maxine Sheinen-Kirchgessner (Manager of Information Security), and Dan Parks. (McFarland Aff. ¶ 10; Greco Aff. ¶ 19; Kirchgessner Aff. ¶ 3.) According to McFarland, Greco and Kirchgessner, the tape revealed that Sosa did not get on his knees or make any sexual gestures. (McFarland Aff. ¶ 11; Greco Aff. 19; Kirchgessner Aff. ¶ 4.) When McFarland and Greco re-interviewed Walton and Hugan after watching the video, they informed them that the video did not support their allegations of Sosa's physical conduct. (McFarland Aff. ¶ 14; Greco Aff. ¶ 21.) At his deposition, however, Walton claimed that he was told that the video *did* show Sosa on his knees making sexual gestures. (Pl.'s Dep. Tr. 75.) In any event, the video was recorded over sometime in mid-April 2007 consistent with Van Ru's recording policies.[5] (Kirchgessner Aff. ¶¶ 2, 6.)

Although Walton claimed that Sosa was never disciplined for his behavior (*see* Pl.'s Dep. Tr. 75), an Employee Discipline Report dated January 14, 2007 reveals that Sosa did in fact receive a written warning and a two day suspension for his "unprofessional conduct." (McFarland Aff. Ex. 1; McFarland Aff. ¶ 16.) Sosa did not make any more homosexual jokes to Walton following January 17, 2007. (Pl.'s Dep. Tr.

---

[5] At a status hearing on April 21, 2011, plaintiff's counsel informed the Court that he intended to file a spoliation motion, which we presume involved the security video. The Court directed plaintiff to file that motion prior to the close of discovery on April 27, 2011. Plaintiff did not file a motion by that date, nor did he ever seek an extension of time to file.

76.)

McFarland's investigation into the Sosa incident also uncovered an allegation that Walton was selling bootlegged pornographic DVDs on the job. (McFarland Aff. ¶ 9; Pl.'s Dep Ex. 25.) McFarland claims that Walton admitted to selling DVDs and that she advised him to stop. (McFarland Aff. ¶ 16.) She subsequently saw him selling DVDs from the trunk of his car. (*Id.*) At his deposition, Walton denied selling pornographic DVDs, but admitted to burning copies of pornographic DVDs for one of his co-workers for a fee. (Pl.'s Dep. Tr. 111-112.)

### D.    Other Incidents Involving Sosa

When questioned at his deposition about other incidents of harassment, Walton testified as to only two other incidents involving Sosa. According to Walton, at the Halloween party in 2006, Sosa asked him about "movies with male on male with big black penises and he wanted me to obtain those for him." (Pl.'s Dep. Tr. 77.) Walton testified that he told Dehurtnis Bryant and Herb Orengo about this comment, but he never submitted a written statement to human resources. (*Id.* at 77-78; Greco ¶ 26.) On another occasion in 2006, Sosa made a joke about "a black guy, white guy and a Chinese guy" that was "somehow intertwined with male on male activity." (Pl.'s Dep Tr. 78.) He did not submit a written statement about this incident either. (*Id*; Greco Aff. ¶ 26.) Walton further testified that he was not afraid of Sosa and that Sosa never physically touched him, exposed himself, or called him a homosexual. (Pl.'s Dep. Tr. 83.) Walton had heard Sosa call Hugan a homosexual. (*Id.*)

### E.    The February 15, 2007 Incident with Magnolia Borgonos

On February 15, 2007, Walton was involved in an incident with collector Magnolia Borgonos. On that date, the phone on a "dummy desk" rang. (Pl.'s Dep. Tr. 86.)

Walton answered the phone and the debtor on a Wells Fargo account asked for "Bryant Jordan," which was supervisor Tim Teague's alias. (*Id.* at 85.) Walton, who claims he was authorized to work Wells accounts, then transferred the call to his own desk to "handle it." (*Id.* at 88.) When he got back to his desk, Borgonos, who was also authorized to work Wells accounts, had already picked up the call. (*Id.*) Walton then went to Borgonos' desk, disconnected the call, and told Borgonos "don't do that to me." (*Id.* at 86.)

After Borgonos complained to McFarland about Walton's behavior, McFarland investigated the incident. (Pl.'s Dep. Ex. 30.) Borgonos purportedly claimed that she felt threatened by Walton and requested that someone walk her to her car after work. (McFarland Aff. ¶ 25.) During McFarland's interview with Walton, he admitted to getting mad at Borgonos and hanging up the line.[6] (McFarland Aff. ¶ 28; Pl.'s Dep. Tr. 85-86.)

Walton's conduct violated Van Ru's Building Guidelines and Rules for Professional Conduct and, at the time, McFarland was of the opinion that Walton had a "reputation for attempting to 'steal' accounts from other collectors." (McFarland Aff. ¶¶ 26, 30.) McFarland told Walton that his behavior was unacceptable and unprofessional, and terminated his employment effective immediately. (*Id.* at ¶ 29 & Ex. 2.) McFarland states that Walton's "misrepresentations of the January 17, 2007 incident" regarding Sosa's physical conduct did not feed into her decision to terminate Walton's employment. (*Id.* at ¶ 31.)

---

[6] It is of no moment that Walton testified that the debtor was on hold when he disconnected the call. (Pl.'s Dep. Tr. 87.) For all practical purposes, Walton undoubtedly terminated the call whether the debtor was on hold or on the line.

At his deposition, Walton testified that another collector, Melissa Sklar, once disconnected a call with a debtor but was not terminated. (Pl.'s Dep. Tr. 90.) Walton was not aware of when Sklar disconnected the call or who she disconnected. (*Id.* at 91.) He also did not know if anyone complained about her or if she was ever written up. (*Id.* at 91-92.) Neither McFarland nor Greco are aware of any other collector hanging up on a debtor, and Sklar's personnel file does not contain any documentation reflecting such an incident. (McFarland Aff. ¶ 32; Greco Aff. ¶ 32.)

## II.    Summary Judgment Standard

Summary judgment is appropriate where the evidence of record shows that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is no genuine dispute of material fact when "no reasonable jury could find in favor of the nonmoving party." *Van Antwerp v. City of Peoria*, 627 F.3d 295, 297 (7th Cir. 2010) (quoting *Brewer v. Bd. of Trs. of the Univ. of Ill.*, 479 F.3d 908, 915 (7th Cir. 2007). The movant bears the initial burden of demonstrating the absence of a genuine issue of material fact by specific citation to the record; if the party succeeds in doing so, the burden shifts to the nonmovant to set forth specific facts showing that there is a genuine issue of fact for trial. Fed. R. Civ. P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The court must construe all facts and draw all inferences from the record in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## III.    Analysis

### A.    Compliance with Local Rule 56.1

Before addressing the substance of defendant's motion, we must address

plaintiff's utter failure to comply with Local Rule 56.1. Under that rule, a party moving for summary judgment must file, among other things, (1) a supporting memorandum of law; and (2) "a statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to a judgment as a matter of law...," which includes "references to the affidavits, parts of the record, and other supporting materials relied upon." LR 56.1(a); *Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009). Each party opposing a motion for summary judgment must then file (1) any opposing affidavits or other materials; (2) a supporting memorandum of law; and (3) a concise response to the movant's statement of facts that contains a response to each numbered paragraph, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon. LR 56.1(b). It is well settled that a district court is entitled to expect strict compliance with LR 56.1 and does not abuse its discretion when, in imposing a penalty for a litigant's non-compliance with that rule, chooses to deem the opposing party's facts admitted. *See Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003)

Here, after being granted three extensions of time to file his response to defendant's motion, plaintiff filed only one document titled, "Plaintiff's Response to Defendant's Purported Local Rule 56.1 Statement of Undisputed Material Facts Relative to Defendant's Motion for Summary Judgment" [53]. Attached to that document are the purported affidavits of Walton and Shaun Crumble. Those affidavits are neither signed, notarized, nor dated with a specific day of the month.[7] Additionally, Walton did not file a memorandum of law, nor did he seek leave to do so even after defendant filed a reply

---

[7] The affidavits are dated "August 2011," but the space in which the specific day should be written has been left blank.

attacking the sufficiency of his filings (or rather lack thereof) and after this Court requested courtesy copies of his filings.

Unfortunately, Walton's only filing, the LR 56.1(b) response, is deficient for a number of reasons. First, although Walton admits a number of defendant's statements of fact, his denials of the remaining factual statements are improper. For example, in response to statements regarding his disciplinary record, which conflict with the allegations of his complaint, plaintiff simply responds that his former attorney did not provide him a copy of the complaint for review. (*See, e.g.,* Pl.'s Resp. to ¶¶ 28-29.) At other times, plaintiff responds that he has insufficient knowledge upon which to admit or deny the statement. (*See, e.g.,* Pl.'s Resp. to ¶¶ 52, 54-56.) Courts have deemed such responses and claims of insufficient knowledge as violative of LR 56.1(b), which requires "specific references to the affidavits, parts of the record, and other supporting materials relied upon." *See, e.g., Rudnicki v. WPNA 1490 AM Alliance Comm's, Inc.,* No. 04 C 5719, 2006 WL 59368, at *1 (N.D. Ill Jan. 4, 2006); *Dumas v. Dovenmuehle Mortg. Inc.*, No. 02 C 6271, 2005 WL 1528262, at *2 (N.D. Ill. June 23, 2005).

Additionally, the affidavits, the only evidence Walton cites to in support of his LR 56.1(b) response, are inadmissable. As an initial matter, the affidavits are not sworn as required for use in a summary judgment proceeding. *See Hancock v. Broullard*, No. 2011 WL 5141510, at *5 (N.D. Ill. Oct. 25, 2011.) ("An affidavit is admissible in a summary judgment proceeding only if it is sworn to before an officer authorized to administer an oath, such as a notary public.") (citations omitted).

While we recognize that unsworn declarations may be admissible pursuant to 28 U.S.C. § 1746, the affidavits here fall well short of the statutory requirements for such declarations. That statute requires the declarant to verify, "under penalty of perjury,"

that his or her statements are "true and correct." 28 U.S.C. § 1746(2). Walton and

Crumble have not provided such a statement. Instead, they state only that they have

"personal knowledge" and "would testify competently to the same before a Court."

Courts have held that this type of language does not comply with 28 U.S.C. § 1746.

*See, e.g, Davenport v. Bd. of Trs. of State Ctr. Cmty Coll. Dist.*, 654 F. Supp. 2d 1073,

1083 (E.D. Cal. 2009). Further, the absence of a signature or specific date easily

proves to be the death knell of these submissions. *See Davis v. Wells Fargo Bank*, 685

F. Supp. 2d 838, 842 (N.D. Ill. 2010) (striking unsigned, unsworn and undated

declarations as inadmissable); *see also, Gross v. Radioshack Corp.*, No. 04 C 4297,

2007 WL 917387, at *7 n. 14 (N.D. Ill. Mar. 26, 2007). For all of these reasons, the

Walton and Crumble affidavits are stricken and Van Ru's statement of facts is deemed

admitted. Of course, we give no weight to inadmissable hearsay statements and, as we

must, we view the facts and draw all inferences in favor of the plaintiff.

As for Walton's failure to file a memorandum of law in response to defendant's

motion, that error remains unexplained. In any event, as defendant points out, Walton's

failure constitutes a waiver of any argument in opposition to the motion.[8] *See Blakely v.

Brach & Brock Confections,* 181 F. Supp. 2d 943, 951 (N.D. Ill. 2002); *Cement-Lock v.

Gas Technology Institute*, 618 F. Supp. 2d 856, 870 (N.D. Ill. 2009). But it does not

follow that defendant is simply entitled to judgment in its favor. *Mara Intern. Furniture,*

---

[8] We note that plaintiff would face an uphill battle if he sought to file a memorandum of law following this ruling. Pursuant to Rule 6(b), courts have discretion to forgive missed deadlines by reason of "excusable neglect." *Sawyer v. Shinseki*, 2011 WL 748825, at *2 (N.D. Ill. Feb. 24, 2011). The standard is "at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission," including the danger of prejudice to the opposing party, the length of the delay and its potential impact on judicial proceedings, the reasons for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith." *Pioneer Investment Services Co. v. Brunswick Associates Ltd. Partnership*, 507 U.S. 380, 395 (1993). On the record before us, plaintiff would have a difficult time meeting this equitable standard.

*LLC v. Village of Hanover Park,* No. 05 C 6036, 2008 WL 565510, at *2 (N.D. Ill. Feb. 27, 2008); *see also, Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 543 (7th Cir. 2011). Instead, we still must determine whether the moving party is entitled to summary judgment based on the facts that have been deemed admitted.[9] *Mara Intern*, 2008 WL 565510 at *2. We turn to that determination now.

### B.    Count I - Hostile Work Environment

As the Supreme Court has held, harassment which is "sufficiently severe or pervasive to alter the conditions of ... employment" is actionable under Title VII. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986). Here, Walton alleges a hostile work environment based on sexual harassment. To survive summary judgment on this claim, Walton must show: (1) he was subjected to unwelcome sexual conduct, advances, or requests; (2) because of his sex; (3) the acts were severe or pervasive enough to create a hostile work environment; and (4) there is a basis for employer liability. *Turner v. The Saloon, Ltd.*, 595 F.3d 679, 688 (7th Cir. 2010). Walton has failed to make this showing for a number of reasons.

First, Walton has done little, if anything, to show that Sosa's treatment of Walton was based on his sex. The Supreme Court made clear in *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80-81 (1998), that the protections of Title VII extend to cases of same-sex sexual harassment, but only to the extent the harassment occurs "because of" the plaintiff's sex. It follows then that in a same-sex harassment case, "so long as the plaintiff demonstrates in some manner that he would not have been treated in the same way had he been a woman," he has satisfied this standard. *Shepherd v.*

---

[9] It is for this reason that we would be hesitant to grant any forthcoming motion for fees incurred in filing the motion, to which defendant alludes in its reply brief. (*See* Reply at 2, n.2.)

13

*Slater Steels Corp.*, 168 F. 3d 998, 1009 (7th Cir. 1999). On the other hand, "inappropriate conduct that is inflicted on both sexes, or is inflicted regardless of sex," is not actionable. *Holman v. Indiana*, 211 F.3d 399, 403 (7th Cir. 2000).

Here, there is certainly no evidence that Sosa treated female co-workers any differently than he treated his male co-workers. *See Holman*, 211 F.3d at 403 (reiterating that Title VII does not cover the "equal opportunity" harasser). Additionally, as the Seventh Circuit has noted, statements such as those alleged here:

> are commonplace in certain circles, and more often than not, when these expressions are used (particularly when uttered by men speaking to other men), their use has no connection whatsoever with the sexual acts to which they make reference-even when they are accompanied...with a crotch-grabbing gesture. Ordinarily, they are simply expressions of animosity or juvenile provocation....

*Johnson v. Hondo, Inc.,* 125 F.3d 408, 412 (7th Cir. 1997). Of course, at a minimum, and viewing the facts in a light most favorable to the plaintiff, one might infer that Sosa's repeated homosexual comments were borne out of sexual attraction towards the same-sex, and in turn, Walton. *See Shepard*, 168 F.3d at 1009.

But, even if we found that Walton satisfied the "discrimination" element of his claim, Sosa's alleged harassment is not so subjectively and objectively severe or pervasive that it altered the conditions of Walton's employment. *Thompson v. Mem'l Hosp. of Carbondale*, 625 F.3d 394, 401 (7th Cir. 2010). To be actionable, "the environment must be one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Smith v. Ne. Ill. Univ.*, 388 F.3d 559, 566 (7th Cir. 2004). To make this determination, courts consider "the severity of the allegedly discriminatory conduct, its frequency, whether it is physically threatening or humiliating or merely offensive, and whether it unreasonably interferes with an

14

employee's work performance." *Overly v. KeyBank Nat. Ass'n*, --- F.3d ----, 2011 WL 5505338, at *4 (7th Cir. 2011) (quoting *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 840 (7th Cir. 2009). We will not find a hostile work environment for mere offensive conduct that is isolated, and is not physically threatening or humiliating. *Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 544 (7th Cir. 2011).

Viewing the facts in plaintiff's favor, Sosa's conduct consists of three homosexual based comments, only one of which was accompanied with sexual gestures, that were spread out over a couple of months, if not more. So, even if we accept Walton's contention that Sosa's conduct was subjectively offensive, it does not satisfy the objective standard. Walton himself characterized Sosa's statements as "jokes," albeit jokes that went "too far." (Pl.'s Dep. Tr. 69-70.) He further testified that Sosa never physically touched him, never exposed himself, never called Walton a homosexual, and that he was not afraid of Sosa. (Pl.'s Dep. Tr. 83.) Additionally, perhaps the most boorish comment was directed at Hugan, not at Walton. *See Ellis v. CCA of Tennessee LLC*, 650 F.3d 640, 647, n.2 (7th Cir. 2011) ("In the context of a hostile work environment claim, secondhand harassment is less severe than firsthand harassment."). And, what is more, there is no indication that Sosa's comments interfered with Walton's ability to perform his job. *See Berry v. Chicago Transit Authority*, 618 F.3d 688, 691-92 (7th Cir. 2010) (affirming summary judgment as to one defendant where plaintiff failed to show, among other things, that the defendant's conduct negatively affected her work performance). Indeed, while Sosa's conduct may have been unpleasant, "Title VII does not set forth a general civility code for the American workplace." *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).

15

Lastly, where as here, the alleged harasser did not have the supervisory authority to "directly affect the terms and conditions of the plaintiff's employment," (*see* Greco Aff. ¶ 11; Pl.'s Dep. Tr. 37), to establish employer liability, the plaintiff must show that the employer has "been negligent either in discovering or remedying the harassment." *Vance v. Ball State University*, 646 F.3d 461, 470 (7th Cir. 2011). The focus is on whether the employer "responded promptly and effectively to the incident." *Porter v. Erie Foods Intern., Inc.,* 576 F.3d 629, 636 (7th Cir. 2009).

The record before us reveals that McFarland, immediately conducted a thorough investigation into Walton and Hugan's complaints about Sosa, which included a number of interviews and review of the security video. (*See* Mcfarland & Greco Affs.) Following the investigation, Van Ru disciplined Sosa, and Walton has admitted that Sosa never made any more inappropriate comments during his remaining weeks of employment. These undisputed facts preclude a finding that there is a basis for employer liability.

For all of these reasons, plaintiff has failed to produce evidence that would permit a jury to conclude that he was subjected to a hostile work environment. Accordingly, defendant's motion is granted with respect to Count I.

## C.     Count II - Retaliation

On his retaliation claim, plaintiff may proceed under either the "direct" or the "indirect method." *Scruggs*, 587 F.3d at 838. Under the direct method, the plaintiff must show that he (1) engaged in statutorily protected activity; (2) he suffered an adverse employment action taken by the employer; and (3) a causal connection between the two. *Overly*, 2011 WL 5505338, at *8 (quoting *Kodl v. Bd. of Educ. Sch. Dist. 45, Villa Park*, 490 F.3d 558, 562 (7th Cir. 2007). To prevail under the indirect method, the plaintiff must show that (1) he engaged in statutorily protected activity; (2) he performed

16

his job according to the employer's expectations; (3) he suffered an adverse employment action; and (4) he was treated less favorably than a similarly situated employee. *Vance*, 646 F.3d at 472. If the plaintiff establishes his *prima facie* case, the burden shifts to the defendant to establish a non-invidious reason for the action. *Id.* The burden then shifts back to the plaintiff to show that the defendant's reason was pretextual. *Id.* Because it is unclear which method plaintiff seeks to invoke here, we address both methods and conclude that plaintiff cannot prevail under either.

As for the direct method, defendant does not dispute, nor could it, that plaintiff's complaint of harassment and his termination satisfy the first two elements. Where plaintiff falls short is the third element, which requires a showing of a causal connection between the complaint and the termination. Here, plaintiff can only rely on the thirty day time frame between the two events.[10] But, suspicious timing, standing alone, "will rarely be sufficient ... to create a triable issue." *Argyropoulos v. City of Alton*, 539 F.3d 724, 734 (7th Cir. 2008) (quotations omitted). Further, given Walton's disciplinary record and the fact that he admitted to the unprofessional conduct that resulted in his termination, we cannot conclude that this is the "rare case" where timing alone may satisfy the direct method. *See Jackson v. Motorola, Inc.*, No. 09 C 1927, 2011 WL 917723, at *10 (N.D. Ill. Mar. 7, 2011) (holding that suspicious timing and poor performance reviews did not satisfy the causal connection element).

Walton also fails under the indirect method because he cannot establish a *prima*

---

[10] In his EEOC charge, Walton also complained that (1) his schedule was changed to include two nights a week; (2) management complained when he was 1-2 minutes late from lunch or break; and (3) disputed accounts were always awarded to the opposing collector. (*See* Pl.'s Dep. Ex. 4.) But, at his deposition, Walton testified that he never actually changed schedules prior to his termination, that he was in fact 1-2 minutes late on occasion, and that he was not disadvantaged by the accounts he was working. (Pl.'s Dep. TR. 94, 99, 104.) As such, his complaints to the EEOC do not support his retaliation claim.

*facie* case of discrimination that would shift the burden to the defendant. First, in the face of Walton's disciplinary record, and his admission of guilt regarding the February 15 incident, we easily conclude that Walton has failed to show that he was meeting his employer's expectations. Walton also fails to provide specific evidence that he was treated less favorably than a similarly situated employee. Instead, Walton testified only generally that an employee named Melissa Sklar hung up on a debtor, but was not terminated. (Pl.'s Dep. 90-93.) Walton did not recall when this incident occurred or whether anyone complained about her conduct. Such vague allegations do not allow us to determine whether Sklar was similarly situated, let alone whether she was treated more favorably. *See Musa-Muaremi v. Florists' Transworld Delivery, Inc.*, 2011 WL 4738520, at *17 (N.D. Ill. Oct. 5 2011) (noting that "the similarly situated requirement is flexible, but there must be enough evidence to perform a meaningful comparison...") (quoting *Argyropoulos*, 539 F.3d at 735).

Finally, even if Walton established his *prima facie* case, Van Ru has provided a nondiscriminatory explanation for his termination, that is, his undisputed interaction with Borgonos. Although Walton may question the severity of his punishment, it is not the court's duty to "sit as a super-personnel department with authority to review an employer's business decision as to whether someone should be fired or disciplined because of a work-rule violation." *Ballance v. City of Springfield*, 424 F.3d 614, 621 (7th Cir. 2005); *see also, Ineichen v. Ameritech*, 410 F.3d 956, 961 (7th Cir. 2005) (noting that it is not the Court's concern that an employer may be "too hard on its employee"). We also note that defendant has submitted documents illustrating that in the two years prior to plaintiff's termination, Van Ru terminated sixty-four employees for violation of company policy and ten employees for FDCPA violations. (*See* Def.'s Ex. 7.) For all of

these reasons, defendant's motion is granted with respect to Count II.

## III.    Conclusion

For the foregoing reasons, defendant's motion for summary judgment [39] is

granted. Judgment is entered in defendant's favor and against plaintiff on Count I and II

of plaintiff's complaint. It is so ordered.


**ENTERED:**


**MICHAEL T. MASON**
**United States Magistrate Judge**


**Dated: December 2, 2011**